SECURITY BANK f/k/a Flower Mound Bank and Gary L. Acker, Appellants,

v.

William H. DALTON, Jan M. Dalton, Dalton & Son Funeral Home, Inc. and Martin Oaks Cemetery and Crematory, Inc., Appellees.

No. 2–90–051–CV.

Court of Appeals of Texas, Fort Worth.

Jan. 16, 1991.

Rehearing Overruled Feb. 19, 1991.

Michael J. Quilling, Baskin & Novakov, Dallas, for appellants.

Michael J. Whitten, David D. Garcia, Law Office of Michael J. Whitten, P.C., Denton, for appellees.

Before JOE SPURLOCK, II, MEYERS and DAY, JJ.

## OPINION

MEYERS, Justice.

Appellants, Security Bank, formerly known as Flower Mound Bank, and Gary Acker, are appealing a judgment rendered against them as defendants below and in favor of appellee William H. Dalton, Jan M. Dalton, Dalton & Son Funeral Home, Inc., and Martin Oaks Cemetery and Crematory, Inc. In the lawsuit filed by appellees on May 31, 1988, the following six causes of action were asserted: wrongful setoff, breach of deposit contract, wrongful dishonor, intentional interference with contractual relations, conversion and breach of the duty of good faith and fair dealing. Appellees later amended their pleadings to raise causes of action for unreasonable collection practices, deceptive trade practices and attorneys' fees.

At trial, the jury rendered a ten-to-two verdict finding that appellants had breached a duty of good faith and fair dealing, wrongfully dishonored appellees' checks and engaged in deceptive trade practices. Appellees were awarded both actual and punitive damages. On appeal from this judgment, appellants raise the following points of error: the trial court erred in denying appellants' motion for judgment non obstante veredicto by failing to disregard the jury's answer to question one which inquired whether appellants had breached a duty of good faith and fair dealing; the trial court erred in denying appellants' motion for judgment non obstante veredicto by failing to disregard the jury's answer to question two which asked whether appellants' breach of the duty of good faith and fair dealing was accompanied by malice; the trial court erred in submitting questions one and two to the jury because no duty of good faith and fair dealing existed as a matter of law; assuming arguendo that a duty of good faith and

fair dealing exists, question one was submitted in improper form and constituted an impermissible comment on the weight of the evidence; the trial court erred in denying appellants' motion for judgment non obstante veredicto by failing to answer to question three; the trial court erred in denying appellants' motion for judgment non obstante veredicto by failing to disregard the jury's answer to question four; the trial court erred in denying appellants' motion for judgment non obstante veredicto by failing to disregard the jury's answer to question five; the trial court erred in denying appellants' motion for judgment non obstante veredicto by failing to disregard the jury's answer to question six; the trial court erred in admitting evidence with respect to agreements between appellees and Flower Mound Bank; the trial court erred in denying appellants' motion for judgment non obstante veredicto by failing to disregard the jury's answer to question eight; and the trial court erred in denying appellants' motion for judgment non obstante veredicto by failing to disregard the jury's answers to question ten.

We reverse and render judgment in favor of appellants on points of error one through four and point of error eleven. We affirm the judgment of the trial court regarding points of error five through ten.

Appellees' relationship with appellant, Security Bank's predecessor, Flower Mound Bank, began in 1984, when Joe Ackley, with whom appellees had conducted numerous banking transactions over the years, became president of Flower Mound Bank and brought appellees' business to Flower Mound Bank with him. On March 2, 1988, Flower Mound Bank was declared insolvent. Its assets were sold and transferred by the Federal Deposit Insurance Corporation ("F.D.I.C.") to appellant Security Bank. Gary Acker was installed as president and chairman of the board of Security Bank, which opened for business on March 3, 1988. Acker owned approximately eighty-one percent of the stock in a holding company which was the sole owner of Security Bank.

When Security Bank acquired the assets and assumed the liabilities of Flower Mound Bank, the bank held approximately nine promissory notes signed by appellees in a combined principal sum of approximately $470,189.01. This amount exceeded the limit of money which the bank could loan to one borrowing entity. These "overline" loans were the result of a mistake on Ackley's part and although he attempted to get other banks to take some of these loans when his mistake was discovered, he was unable to do so because of the current economic conditions. The bank regulators never took action against the bank for these loans and all the loans remained at the Flower Mound Bank. Appellees maintained four separate checking accounts at the bank with a total credit balance of more than $16,000 and two certificates of deposit of $10,000 each. Additionally, appellees had individual retirement accounts at the bank and held a trust account for its "pre-needs" clients with an approximate balance of $170,000 as of March 3, 1988.

William Dalton phoned Security Bank shortly after it opened to ask whether his payments were to be made to Security Bank or the F.D.I.C. Acker informed Dalton that Security Bank kept appellees' loans and that "business will be as usual."

Shortly before Security Bank took over Flower Mound Bank, appellees became concerned about the safety of $170,000 in the "pre-needs" accounts they maintained at Flower Mound Bank. Jan Dalton contacted the State banking department and was informed that it was unwise to leave more than $100,000 in any one bank. Jan Dalton then requested permission from the banking commission to move $70,000 of the "pre-needs" funds to another bank.

Sometime around March 10, 1988, William Dalton met with Acker to discuss the renewal and extension of a note which had matured on February 29, 1988. Although Acker contends that bank policy prohibited making an unsecured loan in excess of $5000 and that appellees were in excess of the bank's legal lending limit, he extended this unsecured $7,000 note for the Daltons.

On March 29, 1988, Jan Dalton received permission from the state banking department to remove $70,000 of pre-need funds from Security Bank as she had previously requested. On the same day Jan Dalton withdrew the funds from the bank, she received a phone call from Pat Rankin, a Security Bank employee, informing her that Acker was upset because Rankin had not assessed a penalty for the early withdrawal of these certificates of deposit against the Daltons. The money was returned to Security Bank by Jan Dalton so that the maturity date could be reached. When appellees removed this same amount of money after the certificates of deposit matured, Acker told them that they did not need to remove the money and his demeanor seemed to indicate his displeasure over the withdrawal.

Appellees contend that Acker never warned them that the bank would not renew two substantial loans to them which came due on May 15, 1988. These loans included a note in the principal amount of $50,000 with an approximate balance of $35,000 which was cross collateralized with a $300,000 term note and a $54,000 note with a balance of approximate $44,000. On May 9, 1988, appellee made interest payments on these two notes. Acker contends that they were notified at this time that the payment was unacceptable and the note should be considered due and payable. On May 13, 1988, Acker wrote appellees a letter stating that each of the notes were due and that Security Bank would not renew either of the notes. Appellees contend that this letter was the first notice they received indicating that Security had no intention of doing "business as usual."

Appellees received Acker's letter on May 14, 1988. They contacted Joe Ackley, who agreed to help them locate alternative financing and then they left town on a planned vacation from which they did not return until May 18, 1988. Unbeknownst to appellees, Acker had placed a "watch" on their accounts and frozen the balance in these accounts on May 12, 1988.

Upon appellees' return home on May 18, 1988, Jan Dalton found a notice in her mail from Security which informed her that her house payment check to Colonial Savings would not be honored. When Jan Dalton phoned the bank, Acker informed her that she and her husband had two notes in default and the money was being held to cover these loans. Several other checks written by appellees were also returned by the bank.

Appellees assert that Acker's actions were the result of malice on his part which arose when appellees withdrew money from Security Bank. Appellees also state that Acker was motivated to treat them badly because the F.D.I.C. forced Acker to service certain other loans which the bank did not wish to keep when Security Bank took over Flower Mound Bank.

Appellees argue that Acker's actions in refusing to renew their loans and freezing their accounts caused them monetary and emotional damages which caused them to bring this lawsuit.

Points of error one through four focus upon the issue of good faith and fair dealing. These related points of error are addressed jointly by appellants and shall be considered in the same manner by this court. Points of error one and two argue that the trial court erred in denying appellants' motion for judgment non obstante veredicto by failing to disregard the jury's answers to questions one and two. Appellant's third point of error complains that the submission of questions one and two to the jury was error since no duty of good faith and fair dealing exists as a matter of law. Point of error four states that assuming arguendo that a duty of good faith and fair dealing exists, question one was submitted in improper form and constituted an impermissible comment on the weight of the evidence.

Questions one and two read as follows:
**QUESTION 1**

Do you find that Defendants engaged in conduct in the course of dealings with Plaintiffs which breached Defendants' duty of good faith and fair dealings and which was a proximate cause of damages, if any, to Plaintiffs?

You are instructed that the term breach of the "duty of good faith and fair dealings" is limited to the following conduct, if any:

a. freezing any of Plaintiffs' accounts;

b. demanding payment on May 13, 1988, of obligations not yet due;

c. accelerating payment of any obligation at a time when Defendants did not have a good faith belief that the prospect of payment or performance of such obligation was impaired;

d. refusing to renew and extend the notes due on May 15, 1988;

e. applying proceeds of Plaintiffs' deposit accounts and certificates of deposit to their notes;

f. failing to request the FDIC to participate in Plaintiffs' loans; and

g. failing to adequately notify Plaintiffs of the actions which Defendants intended to take.

Answer: "Yes" OR "No" concerning the conduct, if any, of each Defendant with regard to each Plaintiff.

**ANSWER:**

As to Security Bank's conduct, if any:

|  | Yes | No |
|---|---|---|
| William H. Dalton | ✓ | |
| Jan M. Dalton | ✓ | |
| Dalton & Son Funeral Home, Inc. | ✓ | |
| Martin Oaks Cemetery and Crematory, Inc. | ✓ | |

As to Gary L. Acker's conduct, if any:

|  | Yes | No |
|---|---|---|
| William H. Dalton | ✓ | |
| Jan M. Dalton | ✓ | |
| Dalton & Son Funeral Home, Inc. | ✓ | |
| Martin Oaks Cemetery and Crematory, Inc. | ✓ | |

If you have answered Question No. 1 "Yes" as to any Plaintiff, then answer Question No. 2. Otherwise, do not answer Question No. 2.

**QUESTION 2**

Do you find the breach of duty of good faith and fair dealings, if any, by Defendants was accompanied by malice on the part of Defendants?

Answer: "Yes" OR "No" concerning the conduct, if any, of each Defendant with regard to each Plaintiff.

**ANSWER:**

As to Security Bank's conduct, if any:

|  | Yes | No |
|---|---|---|
| William H. Dalton | ✓ | |
| Jan M. Dalton | ✓ | |
| Dalton & Son Funeral Home, Inc. | ✓ | |
| Martin Oaks Cemetery and Crematory, Inc. | ✓ | |

As to Gary L. Acker's conduct, if any:

|  | Yes | No |
|---|---|---|
| William H. Dalton | ✓ | |
| Jan M. Dalton | ✓ | |
| Dalton & Son Funeral Home, Inc. | ✓ | |
| Martin Oaks Cemetery and Crematory, Inc. | ✓ | |

At trial, appellees asserted that every contract contains an implied covenant of good faith and fair dealing or, alternatively, that § 1.203 of the Texas Business and Commerce Code imposed such a duty. On appeal, appellants contend that the submission of the above-described questions was error since no duty of good faith and fair dealing existed as a matter of law.

In *Federal Deposit Ins. Corp. v. Coleman*, 795 S.W.2d 706 (Tex.1990), the Texas Supreme Court specifically considered and rejected the existence of a duty of good faith and fair dealing between a lender and its borrower. In so doing, the court stated:

The Court has consistently held, however that a duty of good faith is not imposed in every contract but only in special relationships marked by shared trust or an imbalance in bargaining power. *Aranda [v. Ins. Co. of N. Am.]*, 748 S.W.2d [210] at 212 [(Tex.1988)]; *Arnold [v. National County Mutual Fire Ins. Co.]*, 725 S.W.2d [165] at 167 [(Tex.1987)]; *Manges [v. Guerra]*, 673 S.W.2d [180] at 183 [(Tex.1984)]; *see English v. Fischer*, 660 S.W.2d 521, 524–525 (Tex.1983) (Spears, J. concurring). The relationship of mortgagor and mortgagee ordinarily does not involve a duty of good faith. *See English*, 660 S.W.2d at 522; *Lovell*

*v. Western Nat'l Life Ins. Co.,* 754 S.W.2d 298, 302–303 (Tex.App.—Amarillo 1988, writ denied). Similarly, the relationship between a creditor and guarantor does not ordinarily import a duty of good faith. *Cf. Rodgers v. Tecumseh Bank,* 756 P.2d 1223 (Okla.1988) (no duty of good faith and fair dealing between lender and borrower). In this case, Coleman and Powell do not even assert a special relationship with the holders of their guaranties that would give rise to the duty of good faith and fair dealing that this Court has recognized in other contexts.

*Id.* at 708–09.

Like appellees in the instant case, the guarantors in *Coleman* argued that a duty of good faith and fair dealing arose between a borrower and lender under § 1.203 of the Texas Business and Commerce Code. *See* TEX.BUS. & COM.CODE ANN. § 1.203 (Vernon 1968). In rejecting this argument the court noted that it was not clear that a guaranty was a contract under the Uniform Commercial Code ("U.C.C."). The court further noted that "good faith" under the U.C.C. means "honesty in fact" and does not refer to "diligence." The guarantors argued in *Coleman* that the F.D.I.C. was not diligent, but did not assert that the F.D.I.C. had been dishonest. *Coleman,* 795 S.W.2d at 708. In the instant case appellees complain that they were not given notice of their position with the bank and were misled by Acker's statement that "business will be as usual" between the Daltons and Security Bank, however, it does not appear that they raised allegations of dishonesty in fact.

In *Georgetown Assoc., Ltd. v. Home Fed. Sav. & Loan Ass'n,* 795 S.W.2d 252 (Tex.App.—Houston [14th Dist.] 1990, no writ), the court, citing *Coleman,* also rejected the notion that a duty of good faith and fair dealing exists between a lender and its borrower, by stating:

It is far from clear that the so called duty of good faith even exists. The supreme court has expressly disavowed the duty as a general matter, with an exception for a "special relationship" between

insurers and their insureds. *See English v. Fischer,* 660 S.W.2d 521, 522 (Tex. 1983) (no such nebulous duty); *Arnold v. National Cty. Mut. Fire Ins. Co.,* 725 S.W.2d 165 (Tex.1987) (imposing the duty on insurers). We have adhered to that distinction and the reasoning behind it by keeping the insurance relationships special:

If we were to recognize the employer-employee relationship as "special," that would be tantamount to putting every commercial contract under the umbrella of *Arnold:* vendor-purchaser, lessor-lessee, lender-borrower. Such an extension would undermine the very foundation of *Arnold* by denying that an insurance relationship is deserving of any special protection: it would in effect repudiate the Court's rationale to confuse the exceptional with the everyday.

*McClendon v. Ingersoll–Rand Co.,* 757 S.W.2d 816, 819–20 (Tex.App.—Houston [14th Dist.] 1988), *rev'd on other grounds,* 779 S.W.2d 69 (Tex.1989), *cert. granted,* —— U.S. ——, 110 S.Ct. 1804, 108 L.Ed.2d 935 (1990). We reaffirm our respect for that line today. Insurance relationships remain covered by the *Arnold* exception, and non-insurance relationships by *English.* **Accordingly, there is no free-floating obligation of "good faith".**

*Id.* at 255 (emphasis added).

■ While courts have not found a special relationship to have existed in bank and borrower situations in the past, appellees argue that such a relationship existed in their case. In support of this argument, appellees point to their long-standing relationship with Flower Mound Bank and Joe Ackley, as well as the flexibility of that relationship. Appellees also assert that Acker's comments to William Dalton that business would be "as usual" led them to believe that this special banking relationship continued to exist. However, with the demise of Flower Mound Bank came the demise of any special relationship appellees might have had with their lender. Security Bank is a separate entity from Flower Mound Bank. Security Bank had different

owners than Flower Mound Bank and a new president, Gary Acker.

While appellees may have done business with Ackley for years, Acker was unknown to them prior to his presidency at Security Bank. Thus, no relationship of "shared trust" could have existed between the parties. *Coleman*, 795 S.W.2d at 708–09. Further, as appellees point out, they have been in business since 1969 and have grown into a substantial and profitable business. Appellees being experienced and successful businesspersons, it is doubtful that they were in a position of imbalanced bargaining power. *Id.* As noted by the court in *Coleman,* a duty of good faith is not imposed in every contract, but only in special relationships marked by shared trust or an imbalance in bargaining power. *Id.* Since neither a shared trust nor an imbalance of bargaining power existed in the instant case, appellees could not be said to have had a special relationship with appellants.

Clearly, if a duty of good faith lives in Texas, it does so only within the context of a "special relationship" which, just as in *Coleman* and *Georgetown Assoc.,* the appellees have not demonstrated. Accordingly, we sustain appellants' first four points of error. We find that questions one and two regarding an alleged duty of good faith and fair dealing should not have been submitted to the jury. Thus, the jury's responses to these questions should have been disregarded.

Appellants' fifth and sixth points of error complain that the trial court erred in denying appellants' motion for judgment non obstante veredicto by failing to disregard to the jury's answers to questions three and four. These questions read as follows:

### QUESTION 3

Do you find that the Defendant wrongfully dishonored any of Plaintiffs' checks, which was a proximate cause of damages, if any, to Plaintiffs?

Answer: "Yes" OR "No" concerning the conduct, if any, of each Defendant with regard to each Plaintiff.

### ANSWER:

As to Security Bank's conduct, if any:

| | Yes | No |
|---|---|---|
| William H. Dalton | ✓ | |
| Jan M. Dalton | ✓ | |
| Dalton & Son Funeral Home, Inc. | | ✓ |
| Martin Oaks Cemetery and Crematory, Inc. | ✓ | |

As to Gary L. Acker's conduct, if any:

| | Yes | No |
|---|---|---|
| William H. Dalton | ✓ | |
| Jan M. Dalton | ✓ | |
| Dalton & Son Funeral Home, Inc. | | ✓ |
| Martin Oaks Cemetery and Crematory, Inc. | ✓ | |

If you have answered Question No. 3 "Yes" as to any Plaintiff, then answer Question No. 4. Otherwise, do not answer Question No. 4.

### QUESTION 4

Do you find that the dishonor of Plaintiffs' checks by Defendants was accompanied by malice on the part of the Defendants?

Answer: "Yes" OR "No" concerning the conduct, if any, of each Defendant with regard to each Plaintiff.

### ANSWER:

As to Security Bank's conduct, if any:

| | Yes | No |
|---|---|---|
| William H. Dalton | ✓ | |
| Jan M. Dalton | ✓ | |
| Dalton & Son Funeral Home, Inc. | | ✓ |
| Martin Oaks Cemetery and Crematory, Inc. | ✓ | |

As to Gary L. Acker's conduct, if any:

| | Yes | No |
|---|---|---|
| William H. Dalton | ✓ | |
| Jan M. Dalton | ✓ | |
| Dalton & Son Funeral Home, Inc. | | ✓ |
| Martin Oaks Cemetery and Crematory, Inc. | ✓ | |

Appellants first argue that Gary Acker cannot be held responsible for wrongful dishonor in his individual capacity. Acker was president, chairman of the board and the principal shareholder in the holding company that purchased Security Bank. Appellees' bank accounts were put

under administrative watch and appellees' checks were returned as a result of Acker's direct orders. One who commits a wrongful act while acting in the course and scope of his employment renders both his corporation liable and himself individually liable for the actions taken individually by him. *Kinkler v. Jurica*, 84 Tex. 116, 19 S.W. 359, 360 (1892); *see also Barclay v. Johnson*, 686 S.W.2d 334, 336 (Tex.App.—Houston [1st Dist.] 1985, no writ). The administrative watch and return of these checks were clearly done by Acker in the course and scope of his employment with the bank. These actions being determined wrongful by the jury in the trial below, Acker is thus subject to personal liability for these actions.

Appellants further assert that there was no evidence to support the jury's answers to questions three and four.

In determining a "no evidence" point, we are to consider only the evidence and inferences which tend to support the finding of the jury and disregard all evidence and inferences to the contrary. *See Sherman v. First Nat'l Bank*, 760 S.W.2d 240, 242 (Tex.1988) (per curiam); *Larson v. Cook Consultants, Inc.*, 690 S.W.2d 567, 568 (Tex.1985); *In re King's Estate*, 150 Tex. 662, 244 S.W.2d 660, 661–62 (per curiam). If there is any evidence of probative force to support the finding of the jury, the point must be overruled and the finding upheld. *In re King's Estate*, 150 Tex. 662, 244 S.W.2d at 661–62. A "no evidence" point of error must and may only be sustained when the record discloses one of the following: (1) a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a scintilla of evidence; or (4) the evidence establishes conclusively the opposite of a vital fact. *Commonwealth Lloyd's Ins. Co. v. Thomas*, 678 S.W.2d 278, 288 (Tex. App.—Fort Worth 1984, writ ref'd n.r.e.); Calvert, *"No Evidence" and "Insufficient Evidence" Points of Error*, 38 TEXAS L.REV. 361 (1960).

Examining the record in this case, we find evidence of a vital fact to which we can give weight, which is more than a mere scintilla, in the form of a letter signed by Michael S. Cotter, Cashier of Security Bank, is evidence that the Dalton & Son, Flowers By Dalton, the Dalton's personal checking account, and the Dalton's personal Certificates of Deposit were "placed on hold because their loans were in default as of 5/12/88." Placing these accounts "on hold" was the same as freezing the accounts according to the testimony of Cotter. The documentary evidence and testimony supports a conclusion by the jury that the accounts were frozen as early as Thursday, May 12, 1988, three days before the notes in question were even due.

Additionally, there was evidence, in the form of a bank receipt, that on May 17, 1988, Cecil Dalton made a payment on behalf of appellees on a loan which had allegedly been accelerated on May 16, 1988. A statement of this account received by the Daltons on May 19, 1988, does not reflect this payment. It appears from the evidence that the May 17, 1988 payment was held and the account was accelerated retroactively. Further testimony showed that one check returned by the bank on the Dalton's account was marked "Notice of Insufficient Funds/Balance Held" on May 13, 1988. While appellants put on testimony to show that May 13, 1988, meant May 16, 1988, this testimony was controverted during cross-examination and this evidence was weighed by the jury. Thus, there being evidence to support the jury's answers to questions three and four, the trial court did not err in refusing to disregard the jury's answers to these questions and in denying appellants' motion for non obstante veredicto. Appellants' fifth and sixth points of error are overruled.

The trial court's refusal to disregard the jury's answers to questions five and six and its denial of appellants' motion for judgment non obstante veredicto are complained of in appellants' seventh and eighth points of error. The court's admission of evidence regarding agreements between

appellees and Flower Mound Bank is complained of in point of error nine.

Questions five and six read as follows:

**QUESTION 5**

Do you find that Defendants engaged in any false, misleading or deceptive act or practice in its course of dealings with Plaintiffs which was a producing cause of damages to Plaintiffs?

You are instructed that a "false, misleading or deceptive act or practice" is limited to the following conduct:

a. representing that Defendants' banking services had characteristics, uses and benefits which they did not have;

b. representing that Defendants' banking services were a particular standard of quality, when such services were of another standard of quality other than as represented;

c. representing to Plaintiffs that the deposit contracts and agreements and the loan agreements conferred or involved rights, remedies or obligations which such agreements did not have or involve;

d. failing to disclose information concerning Defendants' banking services which was known by Defendants at the time of the transaction, if the failure to disclose was intended to induce Plaintiffs to enter the transaction, and, Plaintiffs would not have entered the transaction had the information been disclosed.

Answer: "Yes" OR "No" concerning the conduct, if any, of each Defendant with regard to each Plaintiff.

**ANSWER:**

As to Security Bank's conduct, if any:

| | Yes | No |
|---|---|---|
| William H. Dalton | ✓ | |
| Jan M. Dalton | ✓ | |
| Dalton & Son Funeral Home, Inc. | ✓ | |
| Martin Oaks Cemetery and Crematory, Inc. | ✓ | |

As to Gary L. Acker's conduct, if any:

| | Yes | No |
|---|---|---|
| William H. Dalton | ✓ | |
| Jan M. Dalton | ✓ | |
| Dalton & Son Funeral Home, Inc. | ✓ | |
| Martin Oaks Cemetery and Crematory, Inc. | ✓ | |

If you have answered Question No. 5 "Yes" as to any Plaintiff, then answer Question No. 6. Otherwise do not answer Question No. 6.

**QUESTION 6**

Did Defendants knowingly commit any of the conduct that you have found was a producing cause of Plaintiffs' damages in your answer to Question No. 5?

Answer: "Yes" OR "No" concerning the conduct, if any, of each Defendant with regard to each Plaintiff.

**ANSWER:**

As to Security Bank's conduct, if any:

| | Yes | No |
|---|---|---|
| William H. Dalton | ✓ | |
| Jan M. Dalton | ✓ | |
| Dalton & Son Funeral Home, Inc. | ✓ | |
| Martin Oaks Cemetery and Crematory, Inc. | ✓ | |

As to Gary L. Acker's conduct, if any:

| | Yes | No |
|---|---|---|
| William H. Dalton | ✓ | |
| Jan M. Dalton | ✓ | |
| Dalton & Son Funeral Home, Inc. | ✓ | |
| Martin Oaks Cemetery and Crematory, Inc. | ✓ | |

Appellants contend that appellees were not consumers and lacked standing to raise deceptive trade practices claims. The question whether a complaining party is a consumer is a question of law to be decided by the court based upon all the evidence. *Ridco, Inc. v. Sexton,* 623 S.W.2d 792, 795 (Tex.App.—Fort Worth 1981, no writ). If it is determined that the Plaintiff is not a consumer, the court will not submit issues to the jury as to violations of the Deceptive Trade Practices Act. *First Fed. Sav. & Loan Ass'n v. Ritenour,* 704 S.W.2d 895, 898 (Tex.App.—Corpus Christi 1986, writ ref'd n.r.e.).

As authority for the proposition that appellees and their corporate entities were not consumers, appellants cite *Riverside*

*Nat'l Bank v. Lewis,* 603 S.W.2d 169 (Tex. 1980). In that case, Lewis sought a loan from Riverside. He was told that the loan had been approved but a draft issued against the loan proceeds was later refused. In a five-to-four decision, the Supreme Court held, under the facts of the case, that Lewis was not a "consumer" because he was not one "who seeks or acquires by purchase or lease, any goods or services." *Id.* at 171–72. The court noted that Lewis sought only to borrow money and to pay for the use of money over a period of time. The court held that "money" does not fall within the definition of "goods" in § 17.45(1) of the D.T.P.A. which is defined as "tangible chattels or real property purchased or leased for use." *Id.* at 173–74. The court further held that Lewis' attempt to acquire money, or the use of money, was not an attempt to acquire services, defined under § 17.45(2) as "work, labor, or service purchased or leased for use, including services furnished in connection with the sale or repair of goods." *Id.*

The court made it clear that if Lewis had introduced evidence concerning the purpose for which he sought to borrow the money, the result of the case might have been different. The court limited its holding to a situation where the exchange of future amounts of money for that of an amount that the borrower desired to have in the present. It made clear that its reasoning applied only "in the absence of a claim concerning ... collateral activities...." *Id.* at 175.

Subsequent decisions of the court have indicated the limited nature of its holding in *Lewis.* For example, in *Farmers & Merchants, Etc. v. Ferguson,* 605 S.W.2d 320, 324 (Tex.Civ.App.—Fort Worth 1980), *aff'd on other grounds,* 617 S.W.2d 918 (Tex. 1981), a deceptive trade practices claim was brought in connection with the wrongful dishonor of plaintiff's checks drawn on his business account with the bank. The court of civil appeals held that the plaintiff who had been charged a service fee by the bank for his checking account drafts had purchased a service from the bank and was therefore a consumer. The Supreme Court

reversed on the ground that the dishonored checks were written for "business use" and therefore fell outside the ambit of "service" as defined prior to the 1977 amendments to the D.T.P.A. *Id.* at 920.

▉ Where the extension of credit is incident to the sale of a good or service and the conduct of the party extending the credit is intertwined in the transaction, the creditor is subject to the Act. *Knight v. Intern. Harvester Credit Corp.,* 627 S.W.2d 382, 388 (Tex.1982). In *Knight,* the court considered the borrower's purpose in determining whether the borrower was a consumer. The *Knight* court distinguished *Riverside* because the borrower in *Riverside* sought only the extension of credit. *Knight,* on the other hand, sought the purchase of a dump truck. *Id.*

In *La Sara Grain v. First Nat'l Bank of Mercedes,* 673 S.W.2d 558 (Tex.), *appeal after remand,* 676 S.W.2d 183 (Tex.App.—Corpus Christi 1984, no writ), the bank paid corporate checks bearing only one of two required signatures. La Sara sued under the D.T.P.A. and the Supreme Court held that: "The services provided by a bank in connection with a checking account are within the scope of the D.T.P.A." *Id.* at 564.

Because La Sara's complaint alleged that it did not authorize the transaction in question, and in the absence of evidence that any loan was for the purchase of goods or services, the court held that La Sara did not state a claim under the D.T.P.A. because the loan in question involved only an extension of credit. *Id.* The court upheld La Sara's claim for breach of warranty in connection with the services provided by the checking account. *Id.* at 565.

▉ In the present case, appellees are consumers, both in connection with the various checking accounts and in connection with the extensions of credit. The $300,000 real estate lien note and the $50,000 real estate lien note were incurred for the specific purpose of purchasing goods and services, to-wit: the erection of a funeral home building. Flower Mound Bank knew of this purpose when the loan was

made, and the records obtained by Security Bank when it purchased Flower Mound's assets so indicated this purpose. The $48,189 renewal note, originally for $54,000, was for a specific purpose as evidence on the face of the note of "Flower shop fixtures, improvements and inventory." The $34,000 installment note was for the specific purpose of purchasing a 1986 Lincoln funeral coach and was specifically secured by a lien on that vehicle. The Martin Oaks' installment note in the amount of $5,000 was for the specific purchase of equipment in connection with the crematory.

The above-described loans were clearly taken in connection with the purchase of the sale of a good or service and thus qualify appellees as consumers under D.T. P.A. *See Knight*, 627 S.W.2d at 388. As a matter of law, the various checking accounts constitute the provision of services to appellees. *La Sara Grain*, 673 S.W.2d at 564; *Farmers & Merchants, Etc.*, 605 S.W.2d at 324. Thus, appellees had standing as consumers to bring this cause of action under D.T.P.A.

Appellants further argue that no evidence existed to support the finding of a "false, misleading or deceptive act." Reviewing the evidence in this case and applying the standard described above to appellants' "no-evidence" argument, we note several things. In particular we give attention to comments made by Acker to William Dalton that his notes were "good notes" and "business will be as usual" between appellees and appellants. Acker stated the reason for not renewing appellees notes and freezing their accounts was his concern that such a renewal would subject the bank to penalties. However, this argument suffers in face of the evidence that Acker had already renewed a note for appellees after appellees had exceeded the maximum legal lending limit.

Appellants cite *D'Oench, Duhme & Co. v. Federal Deposit Ins. Corp.*, 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed 956 (1942), *Federal Deposit Ins. Corp. v. Langley*, 484 U.S. 86, 108 S.Ct. 396, 98 L.Ed.2d 340 (1987), related cases and the federal statutory law found in 12 U.S.C.A. § 1823 (West

1989) for the proposition that the evidence of appellees' relationship with Flower Mound Bank and Joe Ackley was inadmissible in the present case. However, this is not a case where borrowers seek to defeat the rights of the F.D.I.C., or a purchasing bank, by reliance on some secret agreement with a predecessor bank. The evidence was admissible for the purpose of showing the state of mind of the Daltons and Acker at the time Acker represented that he wished to serve the Daltons and that he would continue to conduct business as usual with them. Appellees' cause of action is not predicated upon enforcement of a secret agreement with Flower Mound, but upon affirmative misrepresentations made by Acker acting in the course and scope of his employment as president of Security Bank after it acquired and owned the Daltons' line of credit.

Appellees do not contend that Flower Mound Bank made representations to them which Security Bank subsequently failed to keep. Rather, appellees contend that Security Bank and Acker, after they were in control, affirmatively misrepresented to the Daltons the manner in which business would be conducted and failed to disclose to the Daltons in a reasonable fashion that the notes in question would not be renewed.

Accordingly, the admission of evidence regarding agreements between appellees and Flower Mound Bank was not error. Appellants' seventh, eighth, and ninth points of error are overruled.

The tenth point of error raised by appellants complains that the trial court erred in denying appellants' motion for judgment non obstante veredicto by failing to disregard the jury's answer to question eight which inquired as to what actual damages would fairly compensate appellees for their injuries. Appellants contend that there was no evidence to support the award of these damages.

Question eight reads as follows:
**QUESTION 8**
What sum of money, if any, if paid now in cash, do you find would fairly and

reasonably compensate the Plaintiffs for their actual damages, if any?

You are instructed that in considering the amount of actual damages, if any, you may consider shame and humiliation in the past and in the future, mental anguish in the past and in the future, injury to Plaintiffs' reputation in the past and in the future, medical expenses in the past and in the future, loss of credit in the past and in the future, loss of time in the past and in the future, loss of money in the past and in the future, and loss of the use of money in the past and in the future.

Answer in dollars and cents, if any, as to each Plaintiff.

**ANSWER:**

| | |
|---|---|
| William H. Dalton | $ 100.00 |
| Jan M. Dalton | $ 15,000.00 |
| Dalton & Son Funeral Home, Inc. | $ 25,000.00 |
| Martin Oaks Cemetery and Crematory, Inc. | $ 100.00 |

The evidence supporting this award of actual damages is set out above in the court's examination of the viability of appellees' D.T.P.A. claim and was sufficient to support the jury's award of actual damages to appellees. Appellants' tenth point of error is overruled.

Appellants' eleventh point of error argues that the trial court erred in denying appellants' motion for judgment non obstante veredicto by failing to disregard the jury's answer to question ten which reads as follows:

**QUESTION 10**

Find from the evidence what sum of money, if any, should be assessed against the Defendants as exemplary damages.

Answer in dollars and cents, if any, as to each Defendant.

**ANSWER:**

| | |
|---|---|
| Security Bank | $ 25,000.00 |
| Gary L. Acker | $ 60,000.00 |

■ Question ten was conditioned upon an affirmative answer to questions two and/or four. Question two regarded appellants' breach of an alleged duty of good faith and fair dealing. For the reasons explained in relation to points of error one through four, we find that no such duty existed in this case, accordingly the damages awarded in connection with this claim must· be and are reversed. Question four inquired whether the dishonor of appellees' checks was accompanied by malice. The wrongful dishonor of checks by a bank is a breach of contract claim based upon the contract between a bank and its depositor: Punitive damages may not be had for a breach of contract.

We reverse this cause as to points of error one through four and eleven. We affirm the remainder of the trial court's decision and render judgment granting appellees all actual damages and costs awarded by the trial court less the $85,000 which was assessed against appellants as exemplary damages.